IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| TINA M. WEBSTER,<br><br>    Plaintiff,<br><br>vs.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>    Defendant. | No. C10-0144<br><br>RULING ON JUDICIAL REVIEW |

TABLE OF CONTENTS

I.    *INTRODUCTION* ................................. 2

II.   *PROCEDURAL BACKGROUND* ..................... 2

III.  *PRINCIPLES OF REVIEW* ......................... 3

IV.  *FACTS* ......................................... 4
    A.    *Webster's Education and Employment Background* ............. 4
    B.    *Administrative Hearing Testimony* ....................... 5
        1.    *Webster's Testimony* ........................ 5
        2.    *Vocational Expert's Testimony* ................... 7
    C.    *Webster's Medical History* ........................... 7

V.   *CONCLUSIONS OF LAW* ......................... 10
    A.    *ALJ's Disability Determination* ...................... 10
    B.    *Objections Raised By Claimant* ...................... 13
        1.    *Substantial Gainful Activity* ..................... 13
        2.    *Listing 12.05C* ............................. 16

VI.  *CONCLUSION* ................................. 19

VII. *ORDER* ..................................... 20

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Tina M. Webster on November 18, 2010, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits. Webster asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits. In the alternative, Webster requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On June 4, 2008, Webster applied for disability insurance benefits. In her application, Webster alleged an inability to work since March 19, 2008 due to a learning disorder. Webster's application was denied on July 29, 2008. On November 12, 2008, her application was denied on reconsideration. On December 2, 2008, Webster requested an administrative hearing before an Administrative Law Judge ("ALJ"). On December 10, 2009, Webster appeared via video conference with her attorney before ALJ Marilyn P. Hamilton for an administrative hearing. Webster and vocational expert Melinda Stahr testified at the hearing. In a decision dated February 3, 2010, the ALJ denied Webster's claim. The ALJ determined that Webster was not disabled and not entitled to disability insurance benefits because she was functionally capable of performing her past relevant work as a dietary aide. Webster appealed the ALJ's decision. On September 18, 2010, the Appeals Council denied Webster's request for review. Consequently, the ALJ's February 3, 2010 decision was adopted as the Commissioner's final decision.

On November 18, 2010, Webster filed this action for judicial review. The Commissioner filed an answer on February 28, 2011. On March 31, 2011, Webster filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she was not disabled and could perform her past relevant as a dietary aide. On May 26, 2011, the Commissioner filed a responsive brief arguing the ALJ's decision

was correct and asking the Court to affirm the ALJ's decision. On January 5, 2011, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole." *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (citation omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) ("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that

decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Webster's Education and Employment Background

Webster was born in 1970. She is a high school graduate. While in school, Webster took special education classes. She testified that she needed help with reading and

writing. At the administrative hearing, the ALJ further questioned Webster regarding her educational abilities:

> Q: Are you able to speak and understand the English language?
> A: Yes. . . .
> Q: If you're not looking at something are you able to read and write?
> A: No. No, I can't.
> Q: Are you able to read and understand a newspaper?
> A: No.
> Q: Add, subtract, make change?
> A: I can do that, because I was good in math.
> Q: Are you able to pay bills?
> A: Yes.

(Administrative Record at 41.)

The record contains an earnings summary report for Webster. The summary report covers Webster's employment history from 1988 to 2008. From 1989 to 2007, she earned between $3,474.32 (1989) and $25,327.82 (2005). She earned $13,102.69 in 2008, and $2,428.00 in the first quarter of 2009.

### B. Administrative Hearing Testimony

#### 1. Webster's Testimony

At the administrative hearing, the ALJ inquired whether Webster was working:

> Q: And how much are you working right now, how many days a week or a month are you working now for Remedy?
> A: It just really depends if they need me or not. Sometime I work seven days a week, six days a week, or three days a week, it just depends.
> Q: And how many hours do you work a day, generally?
> A: Eight hours.
> Q: And how much do they pay you an hour?
> A: 7.25.

(Administrative Record at 47.)

Next, the ALJ and Webster discussed Webster's mental health problems. Upon questioning, Webster testified that: (1) she was not seeing any sort of counselor for her mental health problems; (2) she had not been hospitalized for any mental health concern since March 2008; and (3) she was not taking any medication for depression or any other type of mental health problem. The ALJ also asked Webster to discuss any physical problems that affected her. Webster responded that she had a disc problem in her back. She stated that doctors told her she needed surgery, but she could not afford it. She indicated that working aggravated her back, and she took Tylenol or Advil to relieve the pain.

The ALJ concluded questioning Webster with the following colloquy:

> Q: Has anything changed about your condition since you were working at Heritage?
> A: It just, I have depression, I have a hard time getting a job. The only way I can get a job is somebody helps me fill out application.
> Q: And that's because of the --
> A: No one want to hire me.
> Q: Is it because of the reading and writing difficulties?
> A: Yes.

(Administrative Record at 52.)

Webster's attorney also questioned Webster about her difficulties with depression:

> Q: Okay. You talked a little bit about being depressed and so forth, how does that affect you day to day? What, how, what are you like when you're depressed?
> A: When I'm depressed I start crying, and just don't want to be around nobody. I just want to be by myself.
> Q: How often does that happen?
> A: Maybe once a week, maybe.
> Q: If you get a job call that day do you go, do you say I don't want to go in, or what happens then?
> A: No, I mostly go in and just try to deal with my depression and stuff like that.

(Administrative Record at 54.)

### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Melinda Stahr with a hypothetical for an individual who is:

> able to do only simple, routine, repetitive work. It cannot be production rate pace work, nothing like fast-paced assembly line, but rather goal-oriented work. There should be no requirement to read instructions, write reports, or use a computer as part of the work, or, and there should be no requirement to do math calculations on the job. The job should involve no contact with public. The person can be around coworkers but with only occasional conversations, and then for personal interaction.

(Administrative Record at 57.) The vocational expert testified that under such limitations, Webster could perform her past relevant work as a dietary aide.

### C. Webster's Medical History

On March 20, 2008, Webster met with Dr. Paul Eggerman, Ph.D., for an initial mental health evaluation. Dr. Eggerman noted that:

> [Webster] had difficulty presenting that much in the way of problems other than, 'I'm really stressed when I come home from the job.' It was learned later, however, that she had in fact been fired earlier today. She said that DHS got involved 'almost a year ago.' She said this was due to a friend having grabbed her daughter by the arm and left a bruise. Then someone reportedly told DHS that that same person was watching the children while she was at work. They reportedly pulled the children from the home in February. . . . She clearly presented herself as coming here primarily because her DHS worker told her to. She did not think that she had any issues or problems that she needed to work on here.

(Administrative Record at 265.) Dr. Eggerman diagnosed Webster with adjustment disorder with mixed anxiety and depressed mood and borderline intellectual functioning. Dr. Eggerman concluded that "I do not feel that traditional outpatient psychotherapy is

likely to be a particularly effective way of trying to assist [Webster] in her attempts to deal with a situation that she may find overwhelming at times."[1]

On April 18, 2008, Webster had a follow-up appointment with Dr. Eggerman. At the appointment, Webster indicated that "she does not think she needs or wants any counseling."[2] She also indicated that her "mood and spirits" had been "good." She stated that she is "mostly concerned . . . about concentrating on trying to find a job that will facilitate her getting her kids back."[3] Again, Dr. Eggerman concluded that:

> [Webster] continues to present as someone of limited intelligence whose judgment is probably questionable, at least in some spheres. She does not present as having any motivation for treatment and is a questionable candidate for any kind of traditional outpatient psychotherapy. She did not really provide any clear basis for further services from the Mental Health Center.

(Administrative Record at 272.)

On October 30, 2008, at the request of Disability Determination Services ("DDS"), Webster underwent psychological testing. Upon testing, Webster had a verbal IQ score of 61, performance IQ score of 76, and full scale IQ score of 65. Dr. Barbara Lips, Ph.D., noted that her full scale IQ score places Webster in the "Extremely Low range of general intellectual functioning."[4] Dr. Lips diagnosed Webster with adjustment disorder with mixed anxiety and depressed mood and mild mental retardation. Dr. Lips concluded that Webster's mental limitations for work-related activities would include:

> moderate to great difficulty remembering and understanding instructions, procedures, and locations, and moderate to greater difficulty maintaining attention, concentration, and

---

[1] *See* Administrative Record at 267.

[2] *Id.* at 272.

[3] *Id.*

[4] *See* Administrative Record at 281.

8

> pace in order to carry out instructions effectively. She would be challenged to have to interact effectively with supervisors, coworkers, and the public. She could not be relied upon to exercise good judgment in the workplace, and it would be difficult for her to adjust to workplace changes.

(Administrative Record at 282.)

On November 11, 2008, Dr. Carole Kazmierski, Ph.D., reviewed Webster's medical records and provided DDS with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Webster. On the Psychiatric Review Technique assessment, Dr. Kazmierski diagnosed Webster with borderline intellectual functioning and adjustment disorder. Dr. Kazmierski determined that Webster had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Kazmierski determined that Webster was moderately limited in her ability to: understand and remember detailed instructions, carry out detailed instructions, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Dr. Kazmierski concluded that:

> Though [Webster] was given a mild [mental retardation] diagnosis . . . the bulk of evidence provides support for a [borderline intellectual functioning] diagnosis, and this is the diagnosis previously given [Webster] at Abbe Center. [Webster] has worked for 18 years, and her performance was satisfactory in all respects, except for recent difficulty with stress management. At the time of her firing in March 2008, [Webster's] children had recently been removed from her

> home because of concern about possible physical abuse by an individual living with [Webster]. Given the stress that she was under, [Webster's] conflict with a fellow coworker is perhaps more understandable. . . . [Webster's] supervisor rates [her] ability to relate other coworkers as adequate, thus presumably she was typically able to get along with others in a more amicable fashion.
>
> [Webster's activities of daily living] do not appear significantly restricted. Although she can relate appropriately to others, she likely has difficulty with conflict resolution and would probably be most effective in settings where interpersonal demands are minimal. Her intellectual capacity is somewhat limited, but she can understand and remember simple instructions that are presented verbally. As her [activities of daily living] and her employment history demonstrate, she is capable of performing a range of simple, routine tasks of an unskilled nature.

(Administrative Record at 301.)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Webster is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The five steps an ALJ must consider are:

> (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix"); (4) whether the claimant can return to [his or] her past relevant work; and (5) whether the claimant can adjust to other work in the national economy.

*Moore*, 572 F.3d at 523 (citing 20 C.F.R. § 404.1520(a)(4)(i)-(v)). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the

claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005), in turn quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).

In order to establish a disability claim, "[t]he claimant bears the burden of demonstrating an inability to return to [his or] her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to "show [that] the claimant is capable of performing other work." *Id.* In order to show that a claimant is capable of performing other work, the Commissioner must demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. "'It is the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quoting *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Webster *had* engaged in substantial gainful activity since March 19, 2008, her alleged disability onset date. Specifically, the ALJ found that:

> The record reflects that [Webster] had significant amounts of earnings in 2008 ($13,102.69). While the evidence shows she stopped work at Heritage, a nursing home, on the alleged date of onset of March 19, 2008 because she was fired, [Webster] also testified that she began work at Remedy Temp, a temporary agency, just 4 months later, on July 21, 2008.

> [Webster] testified she has worked for Remedy Temp ever since, at various workplaces for varying stints of employment. She testified she sometimes works six days a week, 8 hours a day, and sometimes works three days a week, 8 hours a day; she is paid $7.25 per hour. Social Security earnings records show [Webster] earned $6,762 for Remedy Temp in 2008, which averages $1,129 monthly for 5 ½ months of work. . . . Thus, the undersigned finds [Webster's] earnings in January through March 2009 averaged more than $2,100 monthly and her earnings in July through December 2009 averaged $1,229 monthly. As this exceeds the $980 monthly level for substantial gainful activity in 2009, accordingly, the undersigned finds that [Webster] was working at substantial gainful activity through at least December 2009.[5] Nonetheless, [Webster] testified that she is currently working part-time, earning approximately $700-800/month, and SSA earnings records show $2,428 earning in the first quarter of 2009 which averages to just over $800 monthly beginning in January 2009. Because [Webster] has not continuously worked at the substantial gainful activity level since the alleged onset date, the undersigned will proceed with the sequential evaluation.

(Administrative Record at 20-21.) At the second step, the ALJ concluded from the medical evidence that Webster had the following severe impairment: mild mental retardation vs. borderline intellectual functioning. At the third step, the ALJ found that Webster did not have an impairment or combination of impairments listed in 20 C.F.R.

---

[5] The ALJ's dates of "January through March 2009," "July through December 2009," "activity in 2009," and "at least December 2009," are clearly typographical errors. Earlier in her discussion of Webster's earning history, the ALJ correctly referred to the year 2008, and following this discussion, the ALJ addresses Webster's actual earning history in 2009. Accordingly, for purposes of review, the Court will consider the ALJ to be referring to earnings in January through March *2008*, July through December *2008*, activity in *2008*, and December *2008*. The Commissioner pointed out this typographical error as well. *See* Commissioner's Brief (docket number 12) at 10 ("Reading the totality of the ALJ's decision, it is clear that she made a typographical error and meant to find that plaintiff worked at substantial gainful activity levels through at least December *2008*.").

Pt. 404, Subpt. P., App. 1. At the fourth step, the ALJ determined Webster's RFC as follows:

> [Webster] has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is capable of performing only simple, routine, repetitive work requiring no contact with the public. Further, such work must not be production-rate pacework, such as fast-pace assembly line work but rather, goal-oriented work. The work cannot require reading instructions, performing math calculations, writing reports, or using computers. Lastly, [Webster] can be around co-workers but with only occasional conversations/interpersonal interaction.

(Administrative Record at 24.) Also at the fourth step, the ALJ determined that Webster was capable of performing her past relevant work as a dietary aide. Therefore, the ALJ concluded that Webster was not disabled.

### B. Objections Raised By Claimant

Webster argues that the ALJ erred in two respects. First, Webster argues that the ALJ erred in finding that she engaged in substantial gainful activity until December 31, 2009. Second, Webster argues that the ALJ erred by failing to find her presumptively disabled due to meeting Listing § 12.05C for mild mental retardation.

#### 1. Substantial Gainful Activity

Webster argues that the ALJ erred in finding that she engaged in substantial gainful activity until December 31, 2009. As discussed in footnote 5 of section *V.A.* of this decision, the ALJ's dates of "January through March 2009," "July through December 2009," "activity in 2009," and "at least December 2009," are clearly a typographical errors, and the dates should be "January through March *2008*," "July through December *2008*," "activity in *2008*," and "at least December *2008*." Furthermore, the Court agrees with the Commissioner, who correctly points out that:

> the ALJ found that [Webster] worked at substantial gainful activity levels through at least December 2009. However, the

> ALJ's discussion leading up to that finding focused exclusively on [Webster's] 2008 earnings. Reading the totality of the ALJ's decision, it is clear that she made a typographical error and meant to find that [Webster] worked at substantial gainful activity levels through at least December *2008*. Indeed, the ALJ separately discussed [Webster's] 2009 earnings in the following paragraph. The ALJ found that [Webster] earned $2,428.00 in the first quarter of 2009, which was below the presumptive monthly substantial gainful activity level for 2009 ($980.00).

*See* Commissioner's Brief (docket number 12) at 10. Accordingly, the Court finds that the ALJ's dates were mere typographical errors. *See Hepp v. Astrue*, 511 F.3d 798, 806 (8th Cir. 2008) ("We have held that 'an "arguable deficiency in opinion-writing technique" does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome.' *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992).").

More substantially, Webster also argues that the ALJ failed to properly evaluate her earnings in 2008 in two respects. First, Webster asserts that:

> The ALJ should have looked at the third and fourth quarters as separate time periods. The Commissioner's policy is that when there is a significant change in work patterns or earnings, the earnings must be averaged over each separate period of work involved to determine if either effort was substantial gainful activity.[6]

*See* Webster's Brief (docket number 10) at 7-8. Second, or in the alternative, Webster argues that even if the ALJ was not required to consider Webster's 2008 third and fourth

---

[6] *See* 20 C.F.R. § 404.1574a(C) ("If there is a significant change in your work pattern or earnings during the period of work requiring evaluation, we will average your earnings over each separate period of work to determine if any of your work efforts were substantial gainful activity.").

quarter earnings separately, she should have determined whether Webster's 2008 work activity at Remedy Intelligence Staffing was an unsuccessful work attempt.[7]

While Webster correctly points out that she earned more money in the third quarter of 2008, than in the fourth quarter of 2008, Webster's argument regarding an "unsuccessful work attempt" fails because there is absolutely no evidence in the record that Webster's lower fourth quarter earnings were caused by her impairment. That is, there is no evidence her impairment forced her "to stop working or to reduce the amount of work" she did; as required by the social security regulations for an "unsuccessful work attempt." *See* 20 C.F.R. § 404.1574(c)(1). The Court believes that the difference in earnings can more likely be attributed to the fact that she worked for a temporary staffing agency, and there was presumably less work for her in the fourth quarter of 2008.

Webster argues that the ALJ erred by not considering her 2008 third quarter earnings and 2008 fourth quarter earnings separately due to a significant change in her work pattern or earnings, but offers no argument and provides no authority which interprets 20 C.F.R. § 404.1574a(C) or explains what constitutes a "significant change" in "work pattern" or "earnings." Based on the record in this case, the Court is unconvinced that a "significant change" occurred requiring the ALJ to consider Webster's 2008 third and fourth quarter earnings separately. Furthermore, even if the ALJ erred by failing to consider Webster's 2008 third and fourth quarter earnings separately, the Court finds that such an error would be harmless because the ALJ did not stop at step one, but instead continued on the five-step sequential steps due to Webster's low earnings in 2009. That is, the ALJ's determination of Webster's substantial gainful work activity in 2008 has no effect on her determination of Webster's RFC or determination that Webster is not

---

[7] *See* 20 C.F.R. § 404.1574(c)(1) ("Ordinarily, work you have done will not show that you are able to do substantial gainful activity if, after working for a period of 6 months or less, your impairment forced you to stop working or to reduce the amount of work you do so that your earnings from such work fall below the substantial gainful activity earnings level[.]").

disabled. *See Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008) (providing that an error by an ALJ is harmless if there is "no indication that the ALJ would have decided differently," had he or she no made the error). In sum, the Court concludes that Webster's arguments on the substantial gainful activity issue neither have merit, nor support a remand of this matter for further consideration.

### 2. *Listing 12.05C*

Listing 12.05C provides in pertinent part:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. In *Maresh v. Barnhart*, 438 F.3d 897 (8th Cir. 2006), the Eighth Circuit summarized the requirements of Listing 12.05C as follows:

> a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing additional and significant work-related limitation of function.

*Id.* at 899.

Webster argues that she meets the requirements set forth in Listing 12.05C. Webster's most recent IQ scores are below 70.[8] Webster also argues that her intellectual

---

[8] At her psychological evaluation in October 2008, Webster was given the Wechsler
(continued...)

functioning was impaired before age 22. In support of her assertion, Webster points out that she had IQ scores below 70 on earlier intelligence testing from when she was a child, and she was enrolled in special education classes when he was in school.[9] Lastly, Webster maintains that her diagnosis of an adjustment disorder imposes an additional work-related limitation as required by Listing 12.05C.

In her decision, the ALJ determined that:

> [Webster] does not meet the requirements of 12.05(C) because [she] does not have another impairment, other than her mild mental retardation vs. borderline intellectual functioning, which imposes an additional and significant work-related limitation of function.

(Administrative Record at 23.) The ALJ further explained that:

> At one point or another in the record, [Webster] has reported the daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations with allegations of disability. [Webster] has no problems with personal care, is capable of preparing meals, and performing house and yard work. Further, [Webster] is able to get around town on her own, and handle shopping responsibilities. [Webster] reports that while she can pay bills, count change, and handle a savings account, she does not know how to balance a checkbook, and cannot read, write, or spell.
>
> The only psychological treatment notes in the file indicate only two treatment sessions, only conducted at the behest of DHS. It is also important to note that [Webster] was fired from her long-term employer, rather than ceasing to work because of her slow learning ability, which is what she alleges is her

---

[8](...continued)
Adult Intelligence Scale, Third Edition test. She had a verbal IQ score of 61, Performance IQ score of 76, and full scale IQ score of 65. *See* Administrative Record at 281.

[9] *See* Administrative Record at 223 (providing verbal IQ scores of 62 and 66 in 1980 and 1986 and full scale IQ scores of 68 and 68 in 1980 and 1986).

> disability. The employer reported that [Webster] was fired for a physical altercation and threatening another co-worker, and using profanity in the presence of a customer. [Webster] testified she did not hit anyone, but was fired for not doing what she was told to do. She also testified that she got unemployment for awhile, until the employer contested it and won at a hearing.
>
> A work questionnaire completed by [Webster's] nursing home employer, for whom she worked from August 1989 until March 2008, indicates [Webster's] performance as a Dietary Aide was good in work quality and in understanding and carrying out simple (1 and 2 step) instructions and procedures. In work quantity, concentration, adaptation to workplace changes, using good judgment, relating to co-workers, supervisors, and the public, and adhering to schedules, [Webster] was rated as adequate. The sole exception was that her former employer noted she had poor workplace stress management skills. However, the undersigned stresses that the preponderance of the report indicates satisfactory performance.

(Administrative Record at 26.) Lastly, the ALJ concluded that:

> In sum, although [Webster] described disabling symptoms as a result of her medical impairment, the record is not consistent with those allegations. The aforementioned particulars suggest that her symptoms are not as severe as alleged in connection with this application and appeal. [Webster] has worked for years at substantial gainful activity, including many months after the alleged date of onset, and her mental status has not changed over the years, with the possible exception of a couple of months in February-March 2008 when she was fired and lost custody of her children. However, she resumed substantial gainful activity just four months later. She admits to no work-related limitations but an inability to complete work applications, read, and write, which is attributable to her low mental capability, and due to her frustration with same, these are accounted for in the quite restrictive residual functional capacity above.

(Administrative Record at 27.)

Having reviewed the entire record, the Court finds that the ALJ's conclusion that Webster does not meet the requirements of Listing 12.05C is supported by substantial evidence in the record as a whole. *See Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008) (providing that the decision of an ALJ should be affirmed if the ALJ's decision is supported by substantial evidence in the record as a whole). In particular, the ALJ fully addressed and discussed her reasons for finding that Webster did not have another impairment which imposed an "additional and significant" work-related limitation. Specifically, the ALJ explained that Webster did not have an additional and significant work-related limitation because the record demonstrated that (1) her daily activities were not significantly limited, (2) she had only two psychological treatment sessions at the behest of a state agency, and the treating psychologist opined that she did not need any psychological treatment, (3) she had a long work history of satisfactory performance, (4) she lost her long-term job for disciplinary reasons rather than for having a disability, and (5) she was able to find a job within four months of being fired from her long-term employment.[10] Therefore, the Court concludes that the ALJ's decision should be affirmed on this issue because "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801; *see also Holley*, 253 F.3d 1091 ("As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.").

## VI. CONCLUSION

The Court determines that Webster's arguments regarding the ALJ's substantial gainful work findings are without merit. The Court further finds that the ALJ properly determined that Webster does not meet the requirements of Listing 12.05C. Accordingly,

---

[10] *See* Administrative Record at 25-27.

the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;
2. Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and
3. The Clerk of Court is directed to enter judgment accordingly.

DATED this 12th day of October, 2011.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA